No. 37.—JOHN BANKS, plaintiff in error, *vs.* HENRY D. DAR-
DEN, for the use of Eugene L. Jerrenaud, defendant in
error.

[1.] The Act of 1853–'4, relative to continuances, only requires the statement
as to what the applicant expects to prove by the absent witness, to be re-
duced to writing; it need not be sworn to.

[2.] The 4th part of the 6th section of the charter of the Planter's and Me-
chanic's Bank of Columbus, is in these words: "The total amount of debts
which the said corporation shall at any time owe, whether by bond, bill,
note or other security, shall not exceed three times the amount of their cap-
ital stock actually paid in, over and above the amount of specie actually
deposited in the vaults for safe-keeping. In case of excess, the directors
under whose administration it shall happen, shall be liable for the same in
their private and individual capacities, and may be sued for the same in
any Court of record in the United States, by any creditor of the corpora-
tion: any condition, covenant or agreement to the contrary, notwithstand-
ing; but this shall not be so construed as to exempt the said corporation,
or the lands, tenements, goods and chattels of the same from being liable
for and chargeable with said excess:" *Held*, that the liability of the direct-
ors is not penal but remedial; joint and not several; and neither absence
nor dissent will relieve a director from liability.

[3.] A Statutory remedy, in derogation of the Common Law, must be strictly
pursued.

[4.] Distinction as to contracts between parties and obligations, *ex quasi con-
tractu.*

[5.] Bank books are competent evidence, both for and against the corpora-
tion; it is admissible, however, to prove by *parol*, independent facts, such
as the division and distribution of stock and the issuing of a large amount
of bills or notes.

[6.] When books are admitted in evidence, they are testimony before the Ju-
ry as to all entries appertaining to the same transaction; still, the party

offering them may select and read to the Jury such portions as answer the purpose for which they were introduced by him, leaving it to the opposite party to submit any other parts that he may see fit.

[7.] If A's title to negotiable paper be good and he transfers to B, B claiming under A's title, will be protected; and a demand by A or his agent will enure to the benefit of B.

[8.] The charter of the Planter's and Mechanic's Bank of Columbus does not require that the whole amount of the capital stock should be paid *in specie*, but twenty-five per cent. thereof or $250.000 only. And in order to charge the directors, it must be shown that there was an excess, and that it happened during their administration, viz: that the total amount of debts which the corporation owed, exceeded three times the amount of capital stock actually paid in at that time.

Assumpsit, &c. in Muscogee Superior Court. Tried before Judge WORRELL, December Term, 1854.

This was an action brought by Henry D. Darden, for the use of Eugene Louis Jerrenaud, against John Banks, to recover the amount of two certificates of deposit, varying only in amount, of one of which the following is a copy :

$5.264 $\frac{12}{100}$         "PLANTER'S & MECHANIC'S BANK, }
                        Columbus, Georgia, Sept. 22, 1841. }
John Peabody has deposited to the credit of D. McDougald, Five Thousand Two Hundred and Sixty-four $\frac{12}{100}$ Dollars, which will be paid to his order on return of this certificate, in current notes.         M. ROBERTSON."
Endorsed, "Pay to H. D. Darden, Esq. without recourse to me,                    D. McDOUGALD,
                                By J. PEABODY.
Pay to the order of F. Cottinett, Esq. without recourse to me."
Across the face written, "Protested for non-payment, 15th Dec. 1842. Protested 16th June, 1842.
            JAMES KELLOGG, N. P. Fees $3."

The ground of liability relied on, was that Banks was a Director and President of the bank, and that there was an over-

issue more than sufficient to pay these certificates, by means of which, under the charter, the directors were personally liable to any creditor.

The defendant filed, among other pleas, the following :

4th. That there were seven directors of the bank, and that the others should have been joined with him.

5th. That plaintiff's right of action did not accrue within six months next before the commencement of his suit.

6th. That it did not accrue within four years next before the commencement of the suit.

7th. Was a similar plea of the Statute of Limitations of four years.

8th. That defendant, at the time of the issuing of the said certificates, was absent from the State of Georgia, and in no wise acting in the matter.

9th. That there were four other directors (naming them,) who were liable jointly with defendant, and should have been joined with him.

10th and 11th was a re-production of the 5th plea.

12th. That the certificates sued on, were issued and delivered to Daniel McDougald, for the purpose of being used by him to raise money for the bank; that he paid nothing into the bank for them; that he subsequently fraudulently used them for his own purposes ; that the bank refused to pay them in June, 1842, and that the plaintiff took them with full notice.

At December Term, 1854, defendant announced himself ready, if the plaintiffs had fully answered certain interrogatories propounded to them by defendant, under the Act of 1847, and the several Acts amendatory thereto.   On examination, it was found that the plaintiff, Darden, had filed answers, but that Jerrenaud had not answered at all; whereupon, the defendant's Counsel moved the Court to non-suit the plaintiffs, which the Court refused.   The defendant's Counsel then moved the Court that an attachment issue to compel Jerrenaud to answer the interrogatories; which motion the Court refused, for the reason, that it was shown, to

Banks *vs.* Darden, for use, &c.

the satisfaction of the Court, that Jerrenaud was in Europe when the interrogatories were taken out, and had not returned, and had no opportunity of answering them—the same having been served on the Counsel. The Counsel for defendant stated to the Court, that he required and insisted on the answers of Jerrenaud, and should object to the case proceeding, until they were had. The Court decided that the defendant was entitled to them, and that it was in the power of the Court to continue the case to obtain the answers; and if a motion was made for that purpose, it would be considered; whereupon, the defendant's Counsel moved that the case be continued at the instance of the plaintiffs, and they be ordered to file such answers; which motion the Court also over-ruled, so far as to charge the plaintiffs with the continuance. The defendant's Counsel then moved to continue the case, upon the ground that said answers had not been filed; whereupon, the Counsel for plaintiff objected, unless the defendant would state, under oath, what he expected to prove by Jerrenaud. The Court held and ruled, that the defendant being in Court, should state, in writing, under oath, what he expected to prove by the answer of Jerrenaud, and that the plaintiff should have the liberty of admitting it, if they thought proper to do so; and that in that event, that he should over-rule the motion for a continuance. The defendant's Counsel declining to do so, the motion for a continuance was over-ruled by the Court, and the trial ordered to proceed. To all of which decisions and rulings of the Court, in regard to the answers of Jerrenaud, and the several motions made by defendant's Counsel, the defendant's Counsel excepted.

The defendant's Counsel demurred to plaintiff's declaration; and for cause of demurrer, alleged that the plaintiff's suit, as shown by his declaration, was brought to recover of the defendant, as director of the Planter's & Mechanic's Bank of Columbus, his debt against the said bank, on the ground that the bank had contracted liabilities to the amount of his claim, more than three times the amount of the capital stock

of said Bank actually paid in, over and above the specie deposited for safe-keeping; and that the Statute incorporating said bank did not authorize any such suit as that instituted by the plaintiffs. Also, that if the Act of incorporation made the directors liable at all, they were jointly, and not severally liable, and that the plaintiffs could not sue a single director. The Court over-ruled the demurrer and objections of defendant's Counsel, and held the suit properly brought.

To which decision and ruling of the Court, defendant's Counsel excepted.

Plaintiffs' Counsel then demurred to and moved to strike the several pleas filed by defendant, and numbered 4, 5, 6, 7, 8, 9, 10, 11 and 12; and after hearing argument, the Court sustained the demurrer and ordered said pleas to be stricken, not striking No. 9 for want of affidavit, but on merits, defendant offering to amend.

To which ruling and decision, the defendant's Counsel also excepted.

These pleas will be found in the former part of the statement of the facts.

Plaintiff's Counsel then introduced ABRAHAM B. RAGAN as a witness, who testified that the persons incorporated by the Act establishing the Planter's & Mechanic's Bank of Columbus, met in Columbus in the Spring of 1837, for the purpose of organizing the bank, and the stock was all taken and divided out between the corporators; that some of them had money in bills of specie paying banks—a few had some specie, and others offered to make good notes. A committee of the stockholders were appointed to take the specie, bills and notes made by the stockholders, and make an arrangement with the Bank of Columbus, for the amount of specie necessary for the organization of the said bank; that said committee did make an arrangement with the Bank of Columbus for specie certificates, stating that the stockholders had on deposit in said bank, in specie, the sum of two hundred and fifty thousand dollars, and delivered and turned the same over to the stockholders; whereupon, seven directors were

elected, one of them chosen president, and a Mr. Peck elected cashier.

Plaintiff's Counsel then proposed to prove by the witness, that some short time thereafter, the directors divided out the stock so paid in, amongst the stockholders who had paid it in. The defendant's Counsel inquired of the witness, if the directors, after the said organization, did not keep a record or minutes of their acts as such, and whether the action of the board, in relation to said disposition of said stock, was not recorded in said minutes. Witness answered in the affirmative; whereupon, the plaintiffs' Counsel proved, by William Dougherty, defendant's Counsel, that some three years since, he had the minutes of the bank in his possession; that he delivered them to Dr. Flewellen, on an order from Judge Alexander, the assignee of the bank, to be used in a law-suit in Alabama. Witness, a short time thereafter, inquired of Mr. Kent, the Counsel for Dr. Flewellen, for the minutes, and was informed that they were left at Col. Holt's office—since which time witness has not seen them, but was informed, a short time since, that they were in the possession of a gentleman in this town; whereupon, defendant's Counsel objected to the witness testifying to said transaction, as there was better evidence of the facts sought to be proved, to-wit: the said minutes of said bank. The Court over-ruled the objection, and the defendant's Counsel excepted.

The witness testified, that some two or three weeks after said organization, the directors passed an order, discounting or loaning out the money so paid in, except two per cent. reserved for expenses, giving the stockholders the preference, upon their making good notes, well endorsed, with the understanding that the same should be paid back when called for. Under this arrangement, the stockholders, generally, made their notes, and drew out the money paid in, except the two per cent.; and the witness now only remembers a single instance where the stockholders did not take the money, and the same was given on the note of another person, not a stockholder. This was done for the reason, that

the directors determined not to engage, at that time, in banking, on account of the derangement in money matters. About that time, all the banks in Georgia, and generally throughout the United States, having suspended specie payment. Witness thought that this derangement was not much worse when the money was discounted out, than when paid in, but was getting gradually worse. Plaintiffs' Counsel proposed to prove by Ragan, that defendant acted as a director in 1837. Defendant's Counsel objected; the Court over-ruled the objection, and the defendant's Counsel excepted. Witness testified, that defendant was a director at the first organization of the bank, but resigned before the order was passed, loaning out the stock paid in, as before stated. Witness further stated, that a new set of directors, and president and officers, were elected in February, 1838, at which time the defendant was elected a director, and when it was resolved to commence banking business; and the directors ordered the issuing of bills to the amount of 280 or 300.000 dollars. At this point, defendant's Counsel inquired of the witness, whether the order and action of the directors, in issuing said bills, was not recorded on the minutes of said bank. Witness answered in the affirmative; whereupon, defendant's Counsel moved to withdraw or suppress the said testimony, as there was higher and better evidence of the same.

The Court over-ruled the motion, and the defendant's Counsel excepted.

Witness testified, further, that the directors, after said second organization, and before issuing said bills, called in 50 per cent. on the notes so given for said stock so loaned. Some fifty or sixty thousand dollars were paid in, in current funds of the State, the bills of suspended banks, except about five hundred dollars, which was paid in in specie, whilst witness remained in said bank, which was until about October, 1838, since which time he has had no connection with said bank; that Matthew Robertson was acting as cashier of said bank, in September, 1841.

Plaintiffs' Counsel introduced, as a witness, THOMAS J.

SHIVERS, who testified, that he was the book-keeper in the Planter's and Mechanic's Bank, from about 1839 to 1842; that the books shown him were the teller's settlement, the cash book and the book showing the statement of the bank. Witness also proved that defendant, John Banks, was a director all the time he was in the bank, and was president for a while in 1841, and thought he was in September, 1841. He went to New York to borrow money for the bank, as much as twice, during the year 1841. Witness proved that he aided in filling up other bills, besides those stated in the issuing books, and that he knew the teller to put some of them in circulation, and he saw them in circulation.

Plaintiffs' Counsel then offered in evidence, the first page of the teller's book.

Defendant's Counsel objected to the same, unless the whole book should be considered in evidence, to be used by either party, and the more especially without the second page referred to, in the first; the plaintiffs' Counsel stating that defendants might introduce the part or parts referred to, if they thought proper. The Court over-ruled the objection, and the testimony was admitted, and the defendants excepted.

The plaintiffs' Counsel then offered in evidence, the single item in each and every teller's settlement, from the first to the 1st. October, 1841; the same being made every three or four days, showing the amount of specie in the bank on the day the settlement or statement was *made*, and the entire settlement of 16th September, 1841. The defendants' Counsel objected to the same going in evidence, unless the whole settlement or statement was offered or went with it; the plaintiffs' Counsel stating, that they might read the balance if they thought proper. The objection was over-ruled, and the evidence, as offered, admitted; to which ruling, defendant's Counsel excepted.

Plaintiffs' Counsel then offered and read in evidence, the certificates of deposit mentioned in plaintiffs' declaration, and the certificate of protest by the notary, Kellogg, and his de-

positions, proving that he presented the certificates at the counter of the bank on 15th June, 1842, and demanded payment, which was refused.

Plaintiffs' Counsel also offered so much of the cash book of the Planter's & Mechanic's Bank, as showed any transaction of Daniel McDougald with said bank, from the 1st. of September, 1841, to 21st October of the same year, inclusive.

Plaintiffs' Counsel then offered in evidence, that part of the books showing the state of the bank on the 17th, 20th, 23d, 27th September and 1st. October, 1841.

Plaintiffs' Counsel having closed his case, defendants' Counsel submitted a motion to non-suit the plaintiffs, on the ground that they had failed to prove any demand on the bank for payment, or an offer to return the same by the plaintiffs before the commencement of the suit or afterwards, and that the proof showed that the demand that was made, was by one who was not the holder of the certificates, and who had no right to demand or receive payment. The Court over-ruled the motion and the defendant's Counsel excepted.

Defendant then introduced MATTHEW ROBERTSON as a witness, who testified, that in the Spring and Summer of 1841, the bank was hard pressed for funds to get along with its business, and it was suggested and recommended by its then president, who was Daniel McDougald, that there should be issued some certificates of deposit, and which should be sent to New York to an agent, to be sold in that market to raise money for the bank, as northern exchange was at a high rate; that southern funds were at a discount; and that witness issued a few, and they were sent on for that purpose. After that time, McDougald resigned the presidency, and the defendant was elected, and the bank still being in great want of money, the defendant left Columbus for New York for the purpose of raising money on his individual credit, and that of his associate directors, to sustain the bank, about the 1st. September, 1841, and returned about the first October thereafter. Whilst the defendant was in New York, and witness thinks about the date of said certificates, the bank was very

much pressed for money; which fact, witness communicated to McDougald, who professed to be friendly to the bank, who immediately suggested to witness, to issue more certificates of deposit, and send them to New York, stating that all the banks had been driven to, and were engaged in that business, and stated to witness that he was going to New York himself, and if he would issue them he (McDougald) would take them on and aid all he could the defendant, who was then in New York, and the agent of the bank, Mr. Clark, in raising money on them.

That witness did adopt the suggestion, and issued a number of said certificates and handed them to McDougald, to be carried to New York for the purpose, and as before stated, and that he, the witness, is not positive, but thinks that the certificates sued on in this case, and shown to witness, are a portion of the batch of certificates issued and placed in the hands of McDougald, as before stated; that if they are a portion of that batch, no money was ever deposited in said bank for them; that the bank never received the smallest. consideration for them, and that they were issued as before stated; nor did the bank ever receive anything from them in the way of proceeds or otherwise, from that time up to the time it closed doors and failed.

Mr. ROBERTSON cross-examined : Stated that he could not state positively that the certificates sued on, were those delivered to McDougald, as before stated, but he thought they were, and the only reasons he supposed they were, was that they bear date about the time that the transaction occurred, and they were for odd sums, which those certificates were issued for; and that in testifying that they were a part of those certificates so delivered to McDougald, he spoke more from his recollection and impressions when those certificates were first shown him, (which was several years since,) than from his recollection at this time; and when he first saw them, he thought they were a portion of those certificates. Witness further stated, that in making up the accounts of the bank, that they were never *forced*, and that on examining the cash book and

finding the certificates of deposit sued on charged, and the account balanced, it would seem that the money was deposited for which they were given, and would be so unless the money was there or something to represent it; that it was their custom, in transactions of this character, and such as was not completed, and were to stand but a short time, to make what they called "cash memorandums," which stood in the · accounts of the bank in the place of cash, and referred to the item, cash memoranda, in the state of the bank, Sept. 16th, 1841. On being further cross-examined, and asked if he had not sworn, on a former occasion, that the bank had received consideration for those certificates, witness answered that he did not remember; and on being asked if it was shown that he had so sworn, which would he say was right or correct, what he swore then or now? Witness stated that he should sooner rely on what he then testified to, as the matter was then fresh in his mind ; and on being shown his answers to a former set of interrogatories, and being asked what he now thought in regard to said certificates, witness stated that he thought he was now mistaken in saying that the certificates sued on, were of those delivered to McDougald, as testified to on direct examination.

Witness' attention was then directed to the entry on cash book, of certain bills of exchange drawn by McDougald on Cottinett, on 11th October, 1841, and testified that they were drawn and used to raise money on for the bank, but they had no connection whatever with the certificates sued on, and was an entirely distinct transaction.

Mr. ROBERTSON, re-examined by defendant's Counsel: Stated that his recollection was distinct as to issuing a batch of certificates and delivering the same to McDougald, as testified to, but his difficulty was, whether the certificates sued on were some of them ; and being again shown his answers to said former interrogatories, he was requested to examine closely, both the interrogatories and answers, and to state whether there was anything in them to change the impressions which he had when he first saw said certificates, as to

their being a part of those delivered to McDougald, as testified to on direct examination, and after re-examining said interrogatories and answers, witness stated that he did not see anything to change his first impressions; that they were a part of the certificates delivered to McDougald.

Defendant's Counsel then offered and read in evidence, the depositions of FRANCIS COTTINETT, in which he testified that the certificates sued on once belonged to him, and were transferred to him by Daniel McDougald. They were then indorsed in blank, "D. McDougald by J. Peabody;" thinks he received them about 15th Sept. 1841. He sent them in Feb. 1842, to H. D. Darden, to be invested in cotton; he failed so to invest them, and they were returned to him; he was the owner of them in June, 1842, and sent them to his lawyer in Columbus; he paid McDougald for the certificates, by honoring his checks; it was a transaction on joint account with McDougald.

The Court charged the Jury, amongst other things, as follows: That if they believed, from the evidence, that the Planter's & Mechanic's Bank made the certificates of deposit sued on, and that Darden, the plaintiff, was the owner of them, and that the bank, at the time of issuing said certificates, owed more than three times the amount of its capital stock actually paid in in specie, over and above the amount of specie in its vaults for safe-keeping; that such excess was equal to or exceeded the amount of said certificates, and that John Banks, the defendant, was a director of said bank at the time of such indebtedness; that then, the plaintiffs' case was made out.

He further charged the Jury, that if they believe, that on the organization of the bank, in February, 1838, when it commenced issuing bills, and until October of that year, only the sum of eight hundred or one thousand dollars, or whatever sum it was, had been paid in specie, that the law presumed that no more was paid in after that time; and if there had been, it was incumbent on defendant to prove it, it being

the opinion of the Court, that by the charter of said bank, its capital stock was to have been paid in specie; and unless so paid, it was not to be considered as any payment at all.

The Court also charged the Jury, that if they believe that the certificates were placed in the hands of McDougald, for the purpose of raising money on them, the law presumes that he did so; and if Cottinett took them of McDougald, the law presumes that he took them fairly, and that he paid value for them; and that the law presumed, and the Jury were bound to presume, that Cottinett took the certificates before they were dishonored, until the contrary appeared.

The Court also charged the Jury, that if they believed that Darden took the certificates of Cottinett after they were dishonored; yet, if they believed that Cottinett took them before they were dishonored, that the defence relied on could not be set up against Darden, unless they believed that Cottinett took them with knowledge that McDougald misapplied them.

The Court also charged the Jury, that if they believe, from the testimony, that McDougald and Cottinett purchased the certificates in partnership, the law presumes they paid value for them, and came by them fairly.

The Court charged the Jury, that if they should believe, from the testimony, that the certificates were placed in the hands of McDougald to raise money for the bank, and that he transferred them to Cottinett, and that Cottinett afterwards drew bills of exchange and paid the bank for them, they were entitled to hold them.

The Court further charged the Jury, if they should believe, from the evidence, that the certificates were issued by the cashier, at the instance of the president, for the purpose of borrowing or raising money, they were good against the bank, and constituted a debt, although no money was deposited, provided that was not known to Cottinett when he took them. And if so, he was not affected by it, and the bank was bound to pay them. To all of which charges, as given, defendant's Counsel excepted.

Defendant's Counsel requested the Court to charge the

Jury, that in the first organization of the Planter's & Mechanic's Bank, it was not necessary that each and every stockholder or subscriber should have in his possession, and by his own hands pay, twenty-five per cent. of the amount of stock subscribed; but if the Jury should believe, from the testimony, that the stockholders, *bona fide*, had individually or collectively, in the Bank of Columbus and the Insurance Bank, in specie, twenty-five per cent. of the capital stock held by them, and placed, in good faith, that specie under the control of the. stockholders, or a committee of the stockholders, or other person authorized to receive it, that such payment would be a compliance with the charter. Which charge the Court refused to give in the language requested, but charged the Jury, that the charter required the twenty-five per cent. of capital stock to be actually and *bona fide* paid in, before the bank could do any business; or it should have that amount on hand; and although it was so paid in, if it was afterwards distributed out amongst the stockholders, or otherwise put out, and at the time the bills were issued, the bank did not have this specie, and in place of it, commenced business on notes given for it, the same was not a compliance with the charter.

Defendant's Counsel also requested the Court to charge the Jury, that it was not necessary, under the charter, that the bank should always keep and have on hand an amount of specie equal to one third of the debts and liabilities of the bank. Which charge the Court did give; and further charged, that the charter of the bank required the stockholders to pay in $250.000 of the capital stock in specie, before commencing business. If this was done, the charter was complied with; and if the debts of the bank did not exceed three times that amount, there was no excess.

Defendants' Counsel also requested the Court to charge the Jury, that if they believe, from the testimony, that Darden obtained the certificates of deposit after they were dishonored, that the defendant could make the same defence that he could make if the suits had been instituted by McDougald;

this charge the Court refused to give, and charged the Jury, that if they should believe, from the evidence, that Cottinett took the certificates innocently and before they were dishonored, and Darden afterwards abtained them from him after dishonored, yet Darden could hold them from the defence that might be set up against McDougald.

Defendants' Counsel also requested the Court to charge the Jury that one partner will be effected by the fraud of. another in their partnership dealings; and if the Jury believe that if the said certificates were given to McDougald to raise money for the bank, and improperly put into circulation by McDougald, and that Cottinett was in co-partnership with McDougald in the use made of the certificates and their misapplication, that he would hold them just as McDougald did, and that the same defence might be urged against him that could be against McDougald; which charge the Court gave and qualified by further charging, that if the Jury believe that McDougald and Cottinett paid the bank for said certificates, they were entitled to them.

Counsel for defendant also requested the Court to charge the Jury, that if they believed, from the evidence, that the certificates were placed in the hands of McDougald for the purpose of raising money on them for the bank, and he misapplied them by converting them to his own use, and thus improperly put them in circulation, that it was necessary that Darden should prove that he paid value received for them before he could recover; which charge the Court refused to give.

The Court was also requested to charge the Jury, that if they should believe that the certificates were passed by McDougald to Cottinett, in payment of a pre-existing debt, after having been delivered to him for the purpose of raising money for the bank, and thus put into circulation, improperply, plaintiffs could not recover on said certificates until he should prove that Cottinett paid value for them; and that if they believed that Darden obtained them of Cottinett after

dishonored, he could not, without such proof; which charge the Court refused to give.

To all of which charges and refusals to charge, as requested, the defendant's Counsel excepted.

Upon these several exceptions error has been assigned.

W. Dougherty & H. Holt, for plaintiffs in error.

Jas. Johnson & Moses, for defendant in error.

*By the Court.*—Lumpkin, J. delivering the opinion.

[1.] The only error, it seems to us, that was committed by the Court, relative to the continuance of the cause, was the construction put upon the Act of 1853–'4. The Court held that the defendant should state, in writing, *under oath,* what he expected to prove by the absent witness, before the plaintiff could be called upon to admit the truth of the facts expected to be established.

The Act reads thus : " No continuance shall be allowed in any case, in any of the Courts of this State, on account of absent witnesses, or for the purpose of procuring testimony, when the opposite party is willing to admit, and does not contest the truth of the facts expected to be proved; and it shall be the duty of the Court in which the case is tried, to order the proof so expected to be made, to be reduced to writing." (*Pamphlet Acts, p.* 52.)

The words of this Act are too plain to need interpretation. All that it requires of the party is, that he reduce his statement to writing. To rule, therefore, that in addition to that, he shall swear to it, is to add to the Statute. And the omission thus supplied by the Court, was not accidental; there was a good reason for it. By the rules of practice, when, on application for a continuance, the party made an affidavit of the facts which he expected to prove by the absent witness, the opposite party was not allowed to force a trial, by admitting the facts stated in such affidavit. (*36th Common Law Rule,* 2 *Kelly,* 473.)

Why not allow a trial to be forced, by admitting the facts

sworn to? The reason was, because the applicant would be tempted to commit perjury, by making oath that he expected to prove more than he really could; and thus obtain a continuance or force his adversary, by making an undue admission, to give him an unconscientious advantage. The Statute was passed to change this rule; and the Legislature having in mind the old practice, and the policy upon which it was predicated, determined to obviate the mischiefs of delay which it occasioned, and at the same time, not to hold out to the applicant any temptation to forswear himself. Hence, it intentionally dispenses with an affidavit, and requires only that the statement, as to what the party expects to prove, be reduced to writing. And upon this point we reverse the judgment of the Circuit Court.

[2.] Was the Court right in over-ruling the demurrer of defendant's Counsel to plaintiffs' writ?

The objections to the declaration were two-fold—1st. Because the liability of the directors created by the 4th rule of the charter of the bank, was penal, and not remedial; and 2dly, That this liability was joint and not several; and that consequently, all of the directors ought to have been included in the suit, or a satisfactory reason assigned for the omission; as that the parties left out were beyond the jurisdiction of the Court, &c.

As to the first ground of demurrer, that the suit should have been for the excess, and that this provision of the Statute was penal; and that any creditor of the corporation, even for five dollars, was entitled to recover the whole amount of excess, leaving the rest remediless, as to this particular security, we cannot, for a moment, yield our assent to such a construction. And we consider the case of *Neal against Moultrie et al.* (12 *Ga. Rep.* 104,) a full adjudication of the point to the contrary.

The Legislature were anxious to protect the community against the evils of over-banking, and an irredeemable currency. And to effect that object, they restricted the issue of bills to three times the amount of specie actually paid in;

that being considered, from experience, the proper relation which paper should bear to specie—the basis of all legitimate banking.  In the next place, not only the corporation, itself, was bound, but the directors were made liable in their individual and private capacities, to *any* creditor, for transcending this ratio, of three to one.  And in the last place, they allowed the bill-holder, in common with every other creditor, to resort, not only to the corporation and to this recourse against the directors, but they gave him, in favor of the circulating medium, over every other class of creditors, the additional right, to hold the persons and property of the stockholders pledged and bound for the ultimate redemption of the bills of the bank.

This construction, and none other, will carry out the meaning and policy of the law.  If support were brought to sustain the previous decision of this Court upon this point, the argument of Mr. Moses, who never fails to relieve in enlightening the labors of this Court, is nothing short of demonstration.

The second ground of demurrer, is as to the non-joinder of the co-directors.  This suit is brought upon two certificates of deposit made by the bank, of which the defendant was a director, and while he was a director; and they constitute a part of an excess created by the administration of the board of which he was a member, and for which he was personally liable.  These certificates were issued by the cashier, Matthew Robertson, and regularly entered on the books of the bank; the director sued being absent, at the time, at the city of New York, attending to the business of the bank.

Did the charter mean to give a separate action against any one of the directors ; and is that according to its spirit and intent?

The 4th part of the 6th section of the charter under which this action was brought, is in these words:

" The total amount of debts which the said corporation shall at any time owe, whether by bond, bill, note or other security, shall not exceed three times the amount of their

capital stock actually paid in, over and above the amount of specie actually deposited in the vaults for safe-keeping. In case of excess, the directors under whose administration it shall happen, shall be liable for the same, in their private and individual capacities, and may be sued for the same in any Court of record in the United States, by any creditor of the corporation, any condition, covenant or agreement to the contrary, notwithstanding; but it shall not be so construed as to exempt the said corporation, or the lands, tenements, goods. and chattles of the same from being liable for and chargeable with the said excess." (*Prince*, 127.)

In the first place, we say, that the language of the Statute is in the plural—"the *directors*" shall be liable, &c. It is said that this is not to determine that the action shall be joint, but that it designates a *class* that shall be liable for the excess; as it speaks of the stockholders as a class who shall be liable for the *bills*. But the analogy fails in this: the stockholders are jointly liable in Equity, and would be at Law, but for the fact that different judgments would be recovered against each, in proportion to his stock. And for this cause, only a joint action, at Law, cannot be brought against the stockholders. The words of the Act would justify, and seem to require it, but the remedy is impracticable, for the reason just given. But no such difficulty lies in the way of a joint suit against the directors. The same verdict and judgment would be rendered against all the defendants.

But it is said, that the directors are not made liable, in their private *capacity*, but in their private and *individual capacities*. And it is asked, why is the word *individual* superadded, if not to show separate—single; and why is *capacities*. used instead of *capacity*, but to show that the Legislature had in its mind the separate capacity of each director?

I am never satisfied, when the rights of persons are made to depend upon this sort of verbal nicety and critical dissection of a Statute. The Acts of our General Assembly are frequently drawn by laymen instead of lawyers; and to apply the legal acumen of *Dwarris* and *Saunders* to their in-

terpretation, is a very uncertain method of arriving at their true meaning. It was simply intended to annex a personal liability to the official delinquency of the directors.

In the parallel provision, in the Commercial Bank of Macon, and a dozen others, the Legislature declare that the directors shall be liable in their "individual, natural and private capacities," thus supperadding the term *natural* to the phrase as it stands in the Planter's & Mechanic's Bank charter; still, they did not suppose that all these words, together, gave the right to sue any one of the directors separately; for it is added, in every one of these charters, "and an action of debt may, in such case, be brought against them or *any* of them, their or *any* of their heirs, executors and administrators." (*See Prince, Title Banks.*)

For the official misconduct of the board of this bank, in creating an excess, there is no escape—neither absence nor dissent from the proceedings; and it is a remarkable fact, too much so to be fortuitous, that every charter which I have examined, from that of the Bank of Augusta in 1810, to the Planter's & Mechanic's in 1836, whenever this personal liability clause, as to the directors, has been introduced *and a separate suit is given*, there is a way of escape provided for such as did not participate in the tortious act. This coincidence, I repeat, is not accidental. Indeed, the reason is manifest. Here are seven directors, one of whom was absent from the State when the illegal act was committed, and another dissented and entered his protest upon the minutes, leaving five only liable to the creditors. But for the provision that *any* of the directors might be sued, the action must have been joint. The creditor would be compelled to include, in his writ, two defendants who were not in default, and who must be acquitted upon the proof at the trial. What, then, would have become of the suit, which could only be joint, when two of the defendants were discharged? Under the law as it stood at the date of these charters, or at any rate, as administered by the Courts, the action would have abated. Who-

does not see the propriety, therefore, of allowing separate actions against one or more of the directors under such circumstances ?

But no way of escape is afforded for any director, under any plea or pretence whatever, under the Planter's & Mechanic's Bank charter. The director may have been a thousand miles off in the service of the institution, as Banks was; still, if an excess of indebtedness be contracted, that excuse will not avail him. He may have been present, laboring to prevent the very abuse by his colleagues for which he is sued, and when the measure was carried over his head, and in despite of his opposition, he may not only have recorded his vote in the negative, but entered his solemn dissent upon the minutes of the board. The law will take no excuse. He was one of the board of directors, under whose administration the charter was violated—that fixes his liability. The bond demands the pound of flesh, and it must be paid.

I ask, under such a charter, is it not mete and proper for *all* the directors to be joined, seeing that all are responsible and no way of escape is provided for any ?

Counsel contend earnestly for their construction, and insist, that in the present case it works well; that here the defendant was not only a director, but president of the bank; and consequently, the manager of its business—the executive head of the concern; that he was in New York for the purpose of raising means outside of the capital, on which to extend the issues of the bank, when he knew that such issues were illegal, and made himself and his co-directors personally liable.

Suppose this were true, and that this bloody legal picture is not over-colored nor the testimony misapprehended, and that, in this instance, the justice, wisdom and foresight of the Legislature, would be amply vindicated, by so construing the charter as to enable "the defrauded creditor to select from an innocent board of directors, who are all equally liable, the great architect of the wrong and ruin that has been thus boldly and recklessly perpetrated on the community."

Every medal has its reverse. Instead of selecting this particular defendant, steeped in guilt, as Counsel imagine and represent him to be, this same construction, it will be observed, would have entitled this plaintiff to have passed him by entirely, notwithstanding he had "fattened on the fruits of the evil he had scattered abroad," and have enforced his demand against any other innocent member of the board of directors. What, then, would have been thought of the "justice, wisdom and foresight" of the Legislature in passing such a law?

Again, it is asked, shall the rules of construction and the laws of pleading, be strained to shield this trustee of the stockholders and of the public, that the plaintiff may lose his debt entirely, and the bill-holders be turned from the directors to innocent stockholders, who confided to the direction, generally, but particularly to this defendant, the president of the bank, the due administration of their affairs?

Admit that the evidence warranted the assumption, that the stockholders, in the Planter's & Mechanic's Bank of *Columbus*, confided to *John Banks*, particularly, the management of their monetary affairs, how does the joinder of all the directors, instead of a suit against him alone, cause the plaintiff "to lose his debt entirely, and the bill-holders to be turned from the directors to the innocent stockholders?" We are at a loss to comprehend this logic; on the contrary, the very reverse of this result is true. Better for the creditor, and better the stockholders, that all seven should be sued, rather than one.

We feel no difficulty, then, in holding that, under the charter of this bank, an action cannot be brought against a single director, unless a sufficient averment is made, showing why the others are left out. The Legislature has not authorized a separate suit, as in most of the other bank charters, in each one of which provision is made for the innocent director to relieve himself from accountability; no such door is opened for the directors of this bank; they are all considered in *pari delicto*. In case of excess, the *directors*, (plural,)

under whose administration it shall happen, shall be liable for the same. But it is not added, as it is in the charters of the Bank of Augusta, Planter's & State Bank, Farmer's Bank of Chattahoochee, Commercial Bank of Macon, and Insurance Bank of Columbus; " and an action of debt in such case, may be brought against them, (the directors,) or *any* of them, their, or *any* of their heirs, executors or administrators," which, or similar words, were indispensably necessary for the purpose of giving a several action against each of the wrong-doers.

After what has already been said, we deem it scarcely ne--cessary to add, that the defence set up, that Banks was absent at the time the debt sued on was contracted, and for some time prior and subsequent, is wholly unavailing. A Statute is a stubborn thing; we can neither add to nor take from it; and the very same course of reasoning by which we satisfied ourselves, that all the directors must be joined, establishes the further fact, that neither absence nor dissent .constitutes any legal excuse for a director under this charter. This plea is·expressly given where a separate action can be ˙brought. But neither a separate action nor this defence are allowable under this charter. We concede that this is a .stringent restriction; but, without it, the ·personal liability clause would be a mockery.

The decision of these questions disposes of many of the .minor points.

[3.] This being a Statutory remedy, a party seeking the benefit of it must pursue it strictly. The non-joinder of all the directors may be taken advantage of at any time, and need not be pleaded on abatement. The plaintiff must make out his case under the law, and according to law. He must .stand *rectus in curia*.

[4.] The 4th plea was unnecessary. The fifth was properly stricken. The Statute of Limitations of six months, applies only to a penalty; but this being a Statutory remedy, the cause of action was not barred under 20 years. The .same reason justifies the striking out the 6th, 7th, 10th, 11th

and 12th pleas, they being all pleas to limitations of six months, and five and six years.   The 8th plea is a duplicate of the 3d, and we have already decided that that was properly stricken out, the Act of incorporation not making the absence of the defendant from the State a good defence. The 9th plea is a duplicate of the 4th, which has already been disposed of.

I would remark, that plaintiffs' Counsel have correctly understood the decision of *Thornton and Lane*, (11 *Ga. R.* 500,) namely: that the individual liability of the directors and of the stockholders, under this charter, is not strictly a contract, although, from convenience, it is frequently called so; but it is an obligation, *quasi ex contractu*, which is imposed by operation of *mere law*.   The State passes a law— the law of incorporation of the Planter's & Mechanic's Bank. This law, unlike public law, is binding upon no one until some one voluntarily assents to make it the rule of his conduct.   The stockholders, in accepting the charter, and the directors, when elected, made it, for themselves, a rule of conduct.   By the issue of more than three dollars to one, the directors committed an illegal—a tortious act, and made themselves personally liable to the plaintiff for a breach of duty, because he was a creditor of the corporation.   And an action *quasi ex contractu* is raised in his·favor against the directors.   This is a Statute liability—it is *quasi ex contractu* —but it cannot be called, technically, a contract; it need not be proved as contracts between parties must be.

[5.] As to the next assignment of error, while we admit that the books of the bank are evidence, both for and against the corporation; still, it was competent to prove, by *parol*, independent facts, such as the division and distribution of the stock, and the issuing of $280 or $300.000 in bills.   We deem it unnecessary to extend the argument upon this point.

[6.] As to the teller's settlement, we apprehend the rule to be this: When books are admitted in evidence, they are testimony before the Jury, as to all entries appertaining to the same transaction; still, the party offering them may se-·

.lect and read to the Jury such portions as answer the purpose for which they were introduced by him, leaving it to the opposite party to submit any other parts that he may see fit.

[7.] It is in proof, that Francis Cottinett was the owner of the certificates in litigation; that he came by them in the due course of trade and for a valuable consideration, and before they were dishonored; and that the demand, by the Notary, of payment, was made at his request; and that the paper was subsequently transferred to H. D. Darden, the plaintiff; therefore, if Cottinett's title to the certificates was good, Darden's was. And all requests made or charges given, contrary to the facts thus proven and uncontradicted, were either hypothetical or erroneous.

We consequently hold, that the Court was right in overruling the defendant's motion to non-suit the plaintiff, because no demand on the bank had been proven by one authorized to make it.

[8.] The Court charged the Jury; that if they believed that the bank, at the time of issuing these certificates, owed more than three times the amount of capital stock actually paid in *in specie*, the directors, at the time, were guilty of an excess, .and therefore liable.

In order to charge the directors, it must be made appear that there was an excess, and that it happened during their :administration, viz: that the total amount of debts which the ·corporation owed, exceeded three times the amount of capital .stock actually paid in at that time, the charter requiring, not the whole amount of the capital stock to be *paid in specie*, but twenty-five per cent. thereof, or $250.000 only.

But how absurd the struggle over this and many other matters in this record, some of which we have intentionally overlooked, upon the maxim, *de minibus*. The defendant was a director of this bank, from its first organization, in 1837, to 1841, when these certificates were issued—*a capite ad calcem*. And what is the startling fact disclosed by the proof before us? Beginning with an issue of $52.000 on a specie basis of $199.88, and ending with an indebtedness of $766.-

544 26, on a specie capital, including capital stock paid in, and deposits of $1.855! Or a circulation of 375 to 1, instead of 3 to 1! And yet, about one half of the bill of exceptions is made up of a Sebastopol fight—mining and counter-mining —assaults and repulses—over the question, of whether or not there was an excess of indebtedness created under the administration of Col. Banks!