## HARGROVES, executor, *vs.* CHAMBERS, *et al.*

The fourth rule of the sixth section of the charter of the Planters & Mechanics' Bank of Columbus provides, that the total amounts of its debts shall at no time exceed three times the amount of the capital stock actually paid in over and above the specie actually deposited in its vaults for safe-keeping.   In case of excess, the directors were made personally liable for the same.   On the 27th January, 1842, and 23d February, 1842, the bank issued to George Hargroves two certificates of deposit, payable to his order on the certificates, with interest from date.   The defendants are the only survivors of the then seven Directors : five are dead, four of them having representatives with estates in the jurisdiction of the Court, and who could be joined in the suit. On the 12th June, 1843, a judgment of forfeiture and dissolution of said corporation was rendered by the Superior Court of Muscogee county, upon proceedings instituted for that purpose, and directed by Acts of the Legislature of 1840 and 1842.   By the Acts, the judgment was to declare a dissolution for all purposes except the right to collect and pay its debts, to sell and convey its real and personal estate; the judgment contained no such saving.   On the 26th May, 1843, the bank assigned all its property and assets of every kind to R. B. A. to pay debts, etc.   The Legislature, in December, 1843, passed another Act, reciting that the decrees of forfeiture had been rendered "as provided for and contemplated by said Acts," and assignment made,

Hargroves *vs.* Chambers.

which was by that Act declared to be valid; the assets of the bank, from neglect or waste of assignee, were lost. By the terms of the charter, the corporation was to continue until the 1st of January, 1857. Suit was brought against the defendants, as directors, for the amount of the two certificates of deposits : *Held*—

1. That the plaintiff was not bound to join the representatives of the deceased directors in the action against the survivor, although under the Act of 1818 he might do so.
2. That the certificates of deposits were not obnoxious to the Act of December 26th, 1837, "to restrain, prevent and make penal the paying away, etc., any bank bill, etc., intended and for circulation, etc., as paper money, having longer time than three days to run after its date before redeemable, etc., payable otherwise than in gold and silver."
3. That these certificates are such debts as are within the meaning of the fourth rule of the sixth section, for the excess of which directors are liable.
3. That the loss of the assets of the bank in the hands of the assignee, and from the neglect or waste of the assignee, did not relieve the directors from their liability, but was the loss of the corporation.
5. That the liability of the directors for these debts was a statutory liability, and not barred by time until after twenty years.
6. That the judgment of forfeiture did not extinguish the liability of the directors.
7. That rights acquired under a temporary statute are permanent and continue, notwithstanding the expiration of the law under which they were acquired, and that the liability of the directors continued.
8. That the debts of the bank were not extinguished by the expiration of the charter, nor the liability of these directors.
9. That the liability of the directors would not be affected, even if the debt was extinguished as to the bank.
10. That the deed of assignment and saving in the Acts of 1842 and 1848 would have saved the debts and liabilities from extinguishment or destruction, even if that rule was in force.

Debt, from Muscogee county. Tried before Judge WOR-RILL, May Term, 1859.

George Hargroves, as executor of George Hargroves, deceased, brought his action of debt against the defendants in error, as the only surviving directors of the Planters & Mechanics' Bank of Columbus, to recover of them the sum of $4,400 25, besides interest, deposited by deceased in his lifetime in said bank, and which the defendants were liable to pay, as was alleged, on account of their violation of the char-

ter of said bank, in this: That at the time of said deposit, the debts which said bank then owed by bond, note, bill or other securities exceeded three times the amount of its capital stock actually paid in in specie over and above the amount of specie actually deposited in the vaults of said bank for safe-keeping.

The case was tried on the following agreed state of facts:

It is admitted that George Hargroves is the executor of George Hargroves, sen., deceased; that at the date of the certificates sued on, George Hargroves, deceased, deposited in said bank the amounts of money therein specified, and said bank, by its then president and cashier, gave him the certificates sued on; that on the 2d day of June, 1842, payment of them was demanded of, and refused by, said bank, and that the bank was sued on them by said Hargroves, deceased, to the July Term, 1842, of the Inferior Court of said county, and judgment thereon rendered against the bank; at the December Term, 1842, execution issued thereon, returned to the July Term, 1843, "no property;" that at the time of issuing said certificates, Chambers, Banks, A. H. Flewellen, W. B. Ector, J. C. Watson, Daniel McDougald and Thomas Berry were the directors of said bank, and that at the time of bringing this suit, they were all dead but Chambers and Banks, and that Flewellen, Ector, McDougald and Watson had representatives and estates in the county of Muscogee, but Berry had no representative in this State; that more than twelve months from the grant of their letters elapsed before suit brought; that at the date of said certificates of deposits, there was an excess of issue within the meaning of the fourth rule of the charter of said bank sufficient to cover the amount of plaintiff's demand; that in 1843, a judgment was rendered in the Superior Court of said county forfeiting the charter of said bank, but that no execution or other process has ever been sued out to execute said judgment, unless the Legislatures of 1840-'1-'2-'3 shall be construed by the Court to be such process, or to waive the necessity of any other execution of said judgment, if any such process were necessary.

It is also admitted that before this, Robert B. Alexander was, by a deed of said bank, appointed the assignee of its assets, and took possession of them; that these assets were sufficient, if they had been collected, to have paid the debts

of the bank, but that they were not collected, and the debts, were not paid; that the deed of assignment was executed by a board of directors, who succeeded these defendants in office; that said deed was duly recorded, and that the assets conveyed in said deed of assignment could, by due diligence on the part of Robert B. Alexander, have been realized and collected, but were not collected, and were not applied to the payment of plaintiff's demand. It is admitted that said Alexander, Hargroves, sen. and plaintiff, resided in the city of Columbus, Georgia, and that said Hargroves, sen., and plaintff knew of said deed of assignment shortly after its execution, and that they did not prosecute a suit to subject said assets so conveyed to the payment of their said claim, further than to bring the suit mentioned above against the bank and take the steps there stated.

It is further admitted that before and at the time of the commencement of this suit, the assets conveyed by said deed of assignment were barred by the Statute of Limitations, or otherwise lost or wasted by the assignee. Also, that the Act in incorporation, and all the Acts of the Legislature bearing upon the questions presented by the record of said case, and this agreement, be considered as in evidence, if necessary.

Plaintiff's counsel requested the Court to charge the jury, that upon the facts as agreed upon, the plaintiff had a right to recover. The Court refused this request, but did charge, that upon the facts, the plaintiff could not recover, and the jury found for defendant.

To which charge and refusal to charge, the plaintiff's counsel then and there excepted, and assigned the same as error.

JOHNSON & SLOAN, for plaintiff in error.

HOLT, *contra.*

*By the Court.*—LYON, J., delivering the opinion.

The plaintiff instituted an action of debt against the defendants for the recovery of the amounts due on the two papers, of which the following are copies:

"PLANTERS & MECHANICS' BANK,
"Columbus, Jan'y 27, 1842.

"George Hargroves, Sen., has on deposit in this bank, twenty-two hundred and fifty dollars, which will be paid to his order, on this certificate, with interest to date.
· "J. C. WATSON, President.
"M. ROBERTSON, Cashier."

"PLANTERS & MECHANICS' BANK,
"Columbus, Feb'y 23, 1842.
"$2,150 25.

"George Hargroves, Esq., Sen., has on deposit in this bank, twenty-one hundred and fifty dollars and twenty-five cents, payable to his order hereon, with legal interest from date.
"J. C. WATSON, President.
"M. ROBERTSON, Cashier."

The plaintiff, by this action, sought to charge the defendants with the payments of these debts, as the only surviving Directors of the Planters & Mechanics' Bank of Columbus, (who were such directors at the time these certificates were issued), on the ground that the indebtedness of the bank, as evidenced by these certificates, at the time, was in excess of three times the amount of the capital stock of said bank actually paid in, over and above the amount of specie actually deposited in the vaults for safe-keeping.

The parties went to trial on the following agreed statement of facts:

"GEO. HARGROVES, Ex'r, etc.,          ⎫
          *vs.*                         ⎬ Debt, etc., in Mucogee Su-
"JAMES M. CHAMBERS and                 ⎪    perior Court.
"JOHN BANKS.                           ⎭

"It is admitted, in the above case, that George Hargroves is the executor of George Hargroves, deceased; that at the date of the certificates sued on, George Hargroves, deceased, deposited in said bank the amount of money therein specified, and said bank, by its then president and cashier, gave him the certificates sued on; that on the 2d day of June, 1842, payment of them was demanded and refused by the bank, that the bank was sued on them by said Hargroves, deceased,

to July Term, 1842, of the Inferior Court of Muscogee county; that judgment was rendered on them against the bank, at the second Term, 1842, of said Court; execution issued thereon, and duly returned to July Term, 1853, 'No property.'

"It is also admitted, that at the time of issuing said certificates, Chambers, Banks, A. H. Flewellen, W. B. Ector, J. C. Watson, Daniel McDougald and Thomas Berry were the directors of said bank, and that at the time of the bringing of this suit they were all dead but Chambers and Banks, and that then Flewellen, Ector, McDougald and Watson had representatives and estates in the County of Muscogee, but Berry had no representative in this State, and that more than twelve months from the grant of their letters elapsed before suit was brought.

"It is admitted, for the purposes of this case, that at the date of said certificates of deposit sued on, there was an excess of issue within the meaning of the fourth rule of the charter of said bank sufficient to cover the amount of plaintiff's demand.

"It is further admitted, that in June, 1843, a judgment was rendered in the Superior Court of said county, a copy of which is attached, etc., but that no execution or other process has ever been sued out to execute said judgment, unless the Acts of the Legislature of 1840–'41–'42–'43 shall be construed by the Court to be such process, or to waive the necessity of any other execution of said judgment, if any such process was necessary.

"It is admitted that, before this, R. B. Alexander was, by a deed of said bank, appointed assignee of assets, and took possession of them (a copy of which is attached.)

"It is admitted, that these assets were sufficient, if collected, to have paid the debts of the bank, but that they were not collected, and the debts were not paid.

"It is further admitted, that said deed of assignment was executed by a board of directors, who succeeded these defendants in office, and that said deed was duly recorded, and that the assets conveyed in said deed of assignment could, by due diligence on the part of R. B. Alexander, have been realized upon and collected, but that they were not collected and were not applied to the payment of plaintiff's demand.

"It is also admitted, that said Alexander, Hargroves, sen.,

and plaintiff resided in the city of Columbus, Georgia, and that said Hargroves, sen., and plaintiff knew of said deed of assignment shortly after its execution, and that they did not prosecute a suit to subject said assets so conveyed to the payment of their said claim, further than to bring the suit mentioned above, versus the bank, and take the steps there stated.

"It is further admitted, that before and at the time of the commencment of this suit, the assets conveyed by the said deed of assignment were barred by the Statute of Limitations, or otherwise lost or wasted by the assignee.

"It is further agreed, that the Act of incorporation, and all the Acts of the Legislature bearing upon the question presented by the record of this case, and this agreement, be considered as in evidence, if necessary.

"It is agreed that the case shall be submitted to the jury on the above statement of facts, and that the Court shall charge the jury upon the law arising thereon, without other pleas or pleadings.

"And it is agreed that either party shall have the right to except to any decision of the Court, and have the same reviewed by the Supreme Court; and it is also agreed that either party may demur to the declaration or pleas, and except to the decision of the Court thereon.

"HOLT.<br>"JOHNSON & SLOAN."

Upon this statement of facts, the Court below charged the jury, that the defendants were not liable. To which ruling, the plaintiff excepted, and brought the case before this Court for review.

Besides the facts stated, the record brought up, includes a copy of the proceedings instituted for the forfeiture of the charter of the bank, and the verdict and judgment of forfeiture had therein, in the Superior Court of Muscogee county on the 13th day of June, 1843. A copy of the deed of assignment made by the bank to Robert B. Alexander on the 26th day of May, 1843, and a schedule of the assets turned over to the assignee.

The suit is founded on the 4th rule of the 6th section of the bank charter, *Prince* 127, in these words:

"The total amount of debts which the said corporation shall at any time owe, whether by bond, bill, note or other

security, shall not exceed three times the amount of their capital stock actually paid in, over and above the amount of specie actually deposited in the vaults for safe-keeping. In case of excess, the directors under whose administration it shall happen, shall be liable for the same in their private and individual capacities, and may be sued for the same in any Court of record in the United States, by any creditor of the corporation, any condition, covenant or agreement to the contrary notwithstanding ; but this shall not exempt the said corporation, or the lands, tenements, goods and chattels of the same from being liable for, and chargeable with, the said excess."

It being admitted that at the date of said certificate of deposits sued on, there was an excess of issue, within the meaning of the fourth rule of the charter of said bank sufficient to cover the amount of the plaintiff's demand, it follows, that the defendants are liable, if these certificates are debts within the meaning of that Act, unless they are relieved from such liability by some fact or facts included in the statement.

The defendants insist, that no recovery can be had in this action against them— .

1st. Because the liability of the directors—if liable at all— is a joint liability, and that all that are in life, and the representatives of all who are deceased, that can, must be joined in the suit, and that four of the persons who were directors with them, and who are dead, have representatives and estates in the jurisdiction of the Court, who can be joined in this action with them, and as they are not, the suit must fail.

2d. That the certificates of deposit being payable to order and bearing interest from date, are void, under the Act of 26th December, 1837.

3d. That these certificates are not such debts as enumerated in the 4th rule of the 6th section.

4th. That the assignment to Robert B. Alexander of all the assets of the bank, together with the confirmation thereof by Act of 1843, (*Cobb,* 120,) and the subsequent waste or loss of these assets, by the assignee, relieved them from all liability.

5th. That the defendants' liability, or rather the plaintiff's right of action is barred by the Statute of Limitations,

whether it be considered a specialty, a simple contract debt, or a penalty, and that it must be one or the other.

6th. That the judgment of forfeiture of 13th June, 1843, operated as a discharge of the defendants' liability.

7th. That when the charter expired, by its own limitation, on the 1st of January, 1857, the liability of defendant created by that Act expired with the law.

8th. That, by the expiration of the charter, the debts due by the bank, together with the liability of defendants, as directors, for those debts, were extinguished.

Before the plaintiff can recover against the defendants, each one of these objections must be overcome; for, if one of them be sustained, unless it should be the first, the plaintiff's right of action is gone.

With this simple statement of the question in controversy, without a comment, although there is a wide field for one, and perhaps a necessary one, I shall proceed to a consideration of the objections, in the order that I have stated them:

1. It was not necessary, to enable plaintiff to recover against the two surviving directors, the defendants, that the representative of those who are dead should be joined with them in this action.

The liability of the directors was a joint one. *Banks vs. Darden,* 18 *Ga.,* 318. The representatives of joint obligors, by the rule of common law, could not be joined in an action with survivors. To remedy this mischief, and for the relief of the creditor, the Act of December 19, 1838, (*Cobb,* 483,) was enacted so that the creditor should " not be compelled," as theretofore, " to sue the survivor alone, but may, at his discretion, sue the survivor or representatives of the deceased person, or the survivor in the same action with the representatives of such deceased person, any law, usage or custom to the contrary notwithstanding." By this Act, the plaintiff is expressly authorized, at his discretion, to bring his suit against the survivor, or against the representative, or against both in the same action, as he may choose. But, it is argued, that that discretion must be a legal one; that, as it is to the interest of the defendants, the representatives should be made parties, so as to compel them to contribute their respective proportions of the liability, and not to suffer the whole to fall on the two out of the seven who happen to be in life, while the estates of the deceased ones are equally lia-

Hargroves vs. Chambers.

ble with them, and that the plaintiff shall not be permitted to use his remedy to their injury.

In the first place, we say, that the statute has given the right to sue either, or both ; that it was perfectly competent for the Legislature to do this, and the right being clearly given, we know of no power to restrict him in the exercise of that right. If the Court should attempt to define the discretion and determine for him in what case he should either sue singly or collectively, then would the right be taken from him, no matter on what pretense. If the discretion was given to the Court to exercise for the benefit of all interested, the question would be different; but it is given to the party, and we have no right to review it. That the exercise of the right operates oppressively in this case, we cannot, even if this were so, change the rule. The complaint would be against the law, and that we could not remedy. But I cannot see how this suit affects the survivors. If it was against all, the plaintiff, even after judgment, could not be forced to collect out of each, *pro rata*. He would have the right then to collect the whole of his debt out of any one of the defendants. If the right of contribution existed at all, I cannot see why it would not prevail whether judgment is had against all, or the one forced to pay.

2. We cannot see how these certificates of deposit can be affected by the Act of 19th December, 1837, (*Cobb*, 102.) That Act was intended to prohibit banks from putting in circulation any paper intended, designed or fitted for circulation as paper money, which may or shall be redeemable or payable, at a longer period of time than three days after the date thereof, or with any other thing than gold and silver coin, at the standard value thereof. These certificates were payable at once—had no time whatever to run. The holder might have, within the hour of their execution, demanded payment. There was nothing in the writing itself restraining him from doing so, or protecting the bank from such demand of immediate payment, and by the writing itself is a transaction to be judged. It is said that they are payable to order, and therefore intended to be negotiated, admitted, and so are the bills of the bank ; still, whether in the hands of the payee or holder, demand can be made and enforced at once. Neither does the fact that they draw interest from the date, affect the validity of the contract. That does not

bring them within the rule of the Act. It may be well argued, that the parties contemplated that the deposits should not be immediately withdrawn, else there would have been no stipulation for the payment of interest. It may be well admitted that the parties intended that the deposits should remain in the bank for an indefinite period; but while the parties had this in contemplation, and so intended, still, the depositor retained the express right to insist on the payment whenever he thought proper to do so. There is nothing in the writing from which the bank could claim a postponement of the demand one hour, and there is nothing restraining the holder from exercising that right. Therefore, the certificates are not obnoxious to the Act of 1837.

3. Then are these certificates of deposit debts within the meaning of the fourth rule of the eighth section of the charter, for the excess of which the directors are liable? We think that they are. The words of the Act are: " The amount of *debts* which the corporation shall at any time owe, whether by bond, bill, note or other security, shall not exceed," etc. It is insisted that these debts are neither by bond, bill, note or other security; that the liability of a bank for deposits is of two kinds : In the one, where the deposit is general, in that case, it goes into the general funds of the bank, and the debtor gets a credit for the same, and the liability is as of an open account; and in the other, where the deposit is special, in that, the money does not go into the general funds of the bank, but remains in specie, and the liability of the bank is that of bailee ; that the liability of the bank, on these deposits, must be either of one or the other of these, and whether of either, it is not within the Act, by bond, bill, note or other security ; that is the argument, if we understand it, and to it we reply, that, whatever may be the character of the deposits, it is not a special one, in the ordinary acceptation of that term ; for it certainly never was intended that the identical money deposited, should remain in the bank in specie, and be returned in the same condition in which it was deposited. The fact that the bank agreed to pay interest, excludes that idea, and establishes the fact that the money deposited was intended to, and did go into the general funds of the bank, to be used and employed by it as other funds of the bank. The deposit became the bank's, and in lieu, the holder accepted

their promise to pay the same amount—not the same funds—back, with interest. Neither is this deposit of that class of general deposits which are passed to the general credit of the depositor, and evidenced by pass-book; for, in that case, the liability is by an open account between the parties. The creditor can check against the balance, but in this case the deposit is evidenced by a certificate, which may be transferred from hand to hand, by indorsement, and the liability of the bank is on the certificate to the holder; that is their promise, and by it they are bound. But whether these certificates be considered as special or general deposits, they are, nevertheless, debts, and debts of the bank, and they (the certificates) afford the evidence of the debts. They are the securities for the debts, as a note, bill or bond is the security of a debt between the parties when the debt is evidenced in that way. Therefore they are debts in the meaning of the fourth rule of the sixth section. Another argument offered on this head is, that there could not be an excess of indebtedness at the time of the issuing of these certificates, as to them; because, although they might be debts, yet, the funds paid in, for which they were issued, were in the bank, and must be considered as balancing that indebtedness; that is, if the certificates were debts, the money paid in constituted a fund, which was then in hand, for their payment, and therefore, as to them there could be no excess. That is true, but the money deposited went at once into the general funds of the bank, and constituted a fund, as much for the payment of other debts as these; but whether that be true or not, we hold that these certificates were *debts*, within the meaning of the rule. The agreement of the parties, that there was an excess of indebtedness at the time, within the meaning of that rule, it follows as of necessity that the directors are liable for such excess.

4. Does the waste or destruction of the assets of the bank, in the hands of Robert B. Alexander, the assignee thereof, release these directors from their liability to the plaintiff?

The principle contended for, as I understand it, may be stated thus: "Where a sufficiency of assets, such as good and collectable notes, etc., is placed in the hands of an assignee by the debtor, for the payment of his debts, which assignment is subsequently declared to be a valid one, and the assignee authorized to collect the assets assigned, and pay

the debts accordingly to the deed of assignment, by an Act of the Legislature, then, if the assignee should, by neglect or waste, fail to make them available, and they should, in consequence, be lost or destroyed, such loss falls on the creditors, and not on the debtor."

The facts are: "That the Legislature, in consequence of the suspension of the Planters' & Mechanics' Bank on the 18th December, 1840, to compel that bank and others in the same situation to resume specie payments and to provide for the forfeiture of their charters, passed an Act, requiring the Governor to issue his proclamation, requiring those banks in suspension to resume payment, and in case of their failure to do so, to cause judicial proceedings to be instituted forthwith against such defaulting banks, in the Superior Court of the county where the same is located, to the end, that the assets of the same be immediately placed in the hands of a receiver, under adequate security, for the benefit of the creditors thereof, and to the end that the charter of such bank may be declared as forfeited and annulled." On the 10th December, 1841, another Act was passed, requiring the Governor to arrest such judicial proceedings as had been instituted against defaulting banks, under the Act of 18th December, 1840, provided such banks should commence to redeem their liabilities in specie by or on the first of January next thereafter. A third Act was passed on the 13th December, 1842, enacting, "that in all cases when judicial proceeding had been commenced by the State against any bank amenable to the provisions of the Act of 18th December, 1840, and which had failed to comply with the requirements of the Act of 10th December, 1841, upon a final trial of such proceeding, and the rendition of a verdict in which a judgment of forfeiture should be pronounced, the Judge shall pronounce the judgment of the dissolution of said corporation for all purposes whatsoever, saving and excepting as to its power, in its corporate name, to collect and pay its debts, and to sell and to convey its estate, real and personal, which power shall be exercised by the receiver or receivers, whose appointments are herein provided for, in the name of said corporation, subject to no control whatever by the said corporation or its officers; and it shall be the duty of the Governor, on being notified thereof by the Judge before whom such case may be determined, to appoint three compe-

Hargroves *vs.* Chambers.

tent persons as receivers for the same, who shall not be indebted to said bank, and who shall give bond, with approved security, to the satisfaction of the Governor, in a sum equal to double the amount of stock subscribed for, and paid into said bank, conditioned for the faithful performance of the trust reposed in them, whose duty it shall be to take charge of and collect as early as practicable, the debts and demands due and owing to said bank, and to pay off and discharge the liabilities of said bank."

After the passage of this Act, and in June, 1843, a general and unqualified judgment of forfeiture was rendered against this bank, but before this judgment was had, and on the 26th day of May, 1843, the bank made a full assignment, by deed to Robert B. Alexander, of "all and singular the property, goods, effects, debts, dues, claims and all other personal estate belonging to, or in any wise appertaining to said Planters & Mechanics' Bank of Columbus," upon trust, "that the said Robert B. Alexander, his heirs, executors, administrators and assigns do, and shall, as soon as convenient, make sale and dispose of so much thereof, and such part thereof, as is in its nature saleable, for the best price, in money, that can or reasonably may be had or obtained for the same, and do and shall collect and get in so much thereof as is not in its nature saleable and is yet outstanding;" and after payment of all expenses, charges, commissions, etc., incident to the execution of the trust, etc.; "and then in trust that he (the said Robert B. Alexander) does, and shall apply the residue of said trust monies to the payment and satisfaction of the several sums of money due and owing by said Planters & Mechanics' Bank of Columbus, to all the creditors of said bank *pari passu,* and without any preference or priority of payment other than such as may be prescribed by law."

No receiver was appointed by the Governor, and on the 23d December, 1843, the Legislature passed another Act, which, after reciting that "judicial proceedings were instituted against the Planters & Mechanics' Bank of Columbus," and others "which resulted in decrees of forfeiture of their several charters *as provided for and contemplated by said Acts*" of 18th December, 1840, 10th December, 1841, and 13th December, 1842, as recited. " *And whereas,* prior to said decrees of forfeiture, each of said banking institutions

Hargroves *vs.* Chambers.

had regularly made assignments of all their property, real and personal, and all their debts, credits and affects for the benefit of their creditors. *And whereas,* under the provisions of the said Act, assented to on the 13th December, 1842, no receivers have been appointed, and no person can be found willing and competent to act as such :

" *Be it enacted,* That from and immediately after the passage of this Act, the assignments severally made by the said banking institutions aforesaid, by the Planters & Mechanics' Bank to Robert B. Alexander, etc., which assignments conform to the Act of the last General Assembly, and are of record in the Clerk's office of the Superior Court of Muscogee county, shall be taken, held and considered valid for all purposes, both at law and in equity."

The assets that were so assigned, were ample to pay the debts, but from neglect or waste of the assignee, Alexander, were lost or destroyed, so that the creditors were not paid, and these directors now insist, that such loss shall fall on the creditors. In support of that position, a case from 1 *Sal.*, 153, is relied on, in which it is stated as a rule, " That when one devised lands to trustees for the payment of debts and legacies, and the trustees raised the money and converted it, so that the debts and legacies remained unpaid, it was resolved that the heir should have the land discharged ; for the estate was debtor for the debts and legacies, but not for the faults of the trustees, and therefore is liable so long as the debts, etc., should or might be paid. And where the land has once borne its burden, and the money is raised, it is discharged, and the trustee liable." To the same effect are the cases of *Carter vs. Barnardiston,* 1 *P. Wms.,* 505 ; *Ivey vs. Gilbert,* 2 *P. Wms.* 20. I must confess, that I cannot see any likeness between the principle of those cases and the one before us ; for, without the charge made on the lands by the devisor, they would not have been subject to the debts or legacies. The charge on the lands and the appointment of trustees to receive and apply the profits are from the same source, and created at the same time and by the same act. It was as competent to appoint the person to receive the funds and apply them to the charge, as it was to make the charge, both being voluntary, and to limit the time for the continuance of the incumbrance, only to that within which the charge might have been raised from rents and

profits. However this might be, the authority of these cases is very doubtful, even for the principle they announce ; for in *Cage vs. Harrison*, 2 *Vern.*, 85, also cited, the Master of the Rolls doubted, took time to consider, and finally, holding to the contrary, decreed that the trust should stand charged, and plaintiff to release and assign bond and judgment, etc. So it was in *Smith vs. Smith*, 2 *Vern.*, 178, citing the case of Sir Andrew Corbitt, where, even at law, if the heir has taken the profits, which should be applied for the payment of debts, the land should remain chargeable therewith. The case of *Massaveen vs. Hutchinson*, 2 *Ball & Beatty*, stands upon a very different footing. In that case, the assignment was to trustees appointed by the creditors for the payment of their debts, were subject to be removed by them. The Court held that the money received by the trustee, from the estates assigned, and which was in his hands at his bankruptcy, was received by him as the agent of the creditor, was a satisfaction *pro tanto*, when it came to his hands, and the loss should fall on the creditor, and if the facts in this case were the same as in that, I should hold likewise ; for, in my opinion, when the creditor himself has the possession of securities for his debt, and suffers a loss by waste or wilful neglect, the loss is his. That, I think, cannot be doubted. The Court stated in that case, if I understand it correctly, that if the trustee had been appointed by the debtor, or even by the Court, on the application even of the creditor, and there was a conversion by the trustee so appointed, the loss would be on the debtor, and not the creditor. That certainly was the dictum of Lord Thurlow in *Riggeo vs. Bowater*, 3 *Bro. C.*, 565 ; and so the rule is stated in 2 *Mad. Ch. Pr.*, 237, and that is going a long ways further than is necessary to go in this case. The next case relied on—and it comes nearer to this case than all others—is that of *Wright vs. Nutt*, 1 *H. Blk. R.* Sir James Wright, who was Governor of Georgia, while a province of Great Britain, fled from Georgia in the war of the revolution, leaving his estate, which was confiscated by Act of the Legislature, and in the Act of confiscation, it was provided, that the debts of Wright due to the citizens and the friends of this republic, should be paid from such estate. Wright himself was excluded from all interest therein or from suing in the State. One Miles Brewton, of the State of South Carolina, had a debt on him which was

not paid from the fund in Georgia, although it was ample for that purpose and for the payment of all other debts. Suit was brought on that debt against Sir James Wright, in England, by the executor of Brewton, or his attorney, and a judgment had at law. Wright died before satisfaction, and when the judgment was about to be enforced against his executors, they filed a bill to enjoin it, and to compel the creditor to look to the fund in Georgia. Brewton, while in life, was a friend of the American Government, and an enemy to Great Britain. Wright, on the contrary, was a British subject, and a great sufferer by the war. Lord Thurlow, on the hearing for the injunction, after stating that the equity of the bill was different from any he ever heard of before that Court, did lay down a rule to meet that case, thus: "I am, therefore, clearly of opinion that, provided a case is made by which it appears that there is in the hands of a creditor either possession of the estate in fact, or the clear means of effecting that possession, he ought to be called on to do so, or at least the Court should interpose. When I have stated that to be my opinion, I *confess that, thinking much of the case of Holditch vs. Mist, I do not know exactly how to reconcile the decision of that case with the principles I have now laid down. The only way I have to deal with it, is to avoid it.*" There are some circumstances in that case which are not in this. Wright, or his executor, by paying up the debt, could not have been remitted to the right of the creditors against the fund in Georgia—a circumstance on which much stress was laid in that case. In this, the directors, by paying up the debts, could have been remitted to the rights of the creditor against the fund in the hands of the assignee. There is another: the fund in Georgia was gone from him, whether the debts were paid or not; and another was the litigants were subjects of different countries, and the fund in one and the litigation in the other. The decision was wrong. There was no such rule of equity as that laid down by the Court. It was manifestly wrong, although concurred in by Lords Loughborough and Kenyon. It was never regarded as a proper precedent or authority even in the Courts of Great Britain. The decision was made in 1789. Afterwards, in 1802, the case of *Wright vs. Simpson,* 6 *Ves.,* 726, came before Lord Eldon, involving the identical principle and presenting nearly the same facts. The Chancellor considers

*Wright vs. Simpson* at length, and his conclusion is: "This is a question of great importance; and if I found myself bound to decide this cause, not upon the facts, but upon the principle laid down in the authorities to which I am referred (that of Lords Thurlow, Loughborough and Kenyon, in *Wright vs. Nutt*,) admitting the facts formed a ground for the application of that principle, I should have been obliged to express a different opinion from all those authorities, as much as I respect them. Lord Thurlow then says, as to *Holditch vs. Mist*, he does not profess to overrule it; but professing not to overrule that case, unless the circumstances relied on by Mr. Richards, that the parties then were subjects of the same country, or other circumstances distinguish it: I say, Lord Thurlow has overruled it. But the point is decided, if *Holditch vs. Mist* stands. That case is directly in point. Can it be said that the Legislature intended to make a provision for the creditors, not requiring them to come in as against the provision, and that they should retain the power of suing the debtor personally? Then there was an absence of intention. Their inclination would rather have been to take away that power; but without adverting to that, they did leave it. There was a creditor in possession of all the rights Lords Thurlow, Kenyon and Loughborough allude to, except the circumstance of not being able to assign the fund, and he refuses to go in, and proceeds personally. This Court then said, *it was the natural, legal, genuine fruit of the contract*, and what equity was there, independent of the incapacity to assign the fund? That case is an authority directly, and I must know satisfactorily why it should be overruled." The facts in *Holditch vs. Mist*, 1 P. Wms., 695, are: Holditch was sued by Mist to recover £800. The defendant at law brought his bill and moved for an injunction, urging that, in regard to the late Act, 7 Ga., 1 c., 27, had vested all his estate in the trustees for the South Sea Company, and made a provision for the payment of his debts (being late a director) out of his estate. The defendant, Mist, ought to repair to the trustees; that it would be extremely hard to permit the plaintiff at law to take out execution against the body of his debtor; and the injunction in that case was refused. Admit, now, that the case of *Wright vs. Nutt* is in point, would this Court be justifiable in adhering to the rule laid down in it, or should we not rather—are we

not bound to enforce that of *Holditch vs. Mist?*    Most clearly. But the cases other than that of *Holditch vs. Mist* are not in point.    These are the authorities referred to in support of the position of defendants.    They utterly fail to make a case for them.    What Judge McDonald has said in *Robinson vs. Lane*, 19 *Ga.*, 364, is so appropriate, I extract from it: " The assignee "—Robert B. Alexander—" was not the agent of the creditors; he was not subject to their control; he was made assignee without consultation with them; they have relinquished no right which they had against the bank or directors ; the bank might have been sued by them, notwithstanding the assignment, they have neither directly nor indirectly, in consideration of the assignment, released the bank from liability; the bank could not plead in bar the assignment.    The creditors cannot be forced by the debtor to accept an assignment in satisfaction ; this can be done by contract alone, and there is no contract, express or implied, which discharges the bank or the directors, in consequence of the assignment.    This is not the case of collaterals pledged to creditors for the payment of his debt, and he loses them by negligence."    This creditor had no voice in the selection of the assignee ; on the contrary, he was appointed by the bank, not in pursuance of the requisition of the Act of the Legislature, but in avoidance of it.    The Legislature subsequently ratified that Act, so far as to accept what the bank had done and made valid, an assignment, which the bank no doubt had many reasons to doubt, and as the Act was for that purpose only, giving him no new powers, a fair presumption is, that it was done upon the application of the bank, and not of the creditor.    But it is complained that all the means of the bank for payment of debts have been stripped from it by law, and they—the officers and the bank—excluded from all control or interference with the assets, and that now all these have become, in consequence, lost, it is extremely harsh, unheard of rigor to still continue the liability of the directors !    Upon what a slender foundation rests this magnificent structure !    Instead of the bank's being stripped of its assets by law, it was stripped of all its assets just sixteen days before the law could get hold of them by its own act, in an assignment to one of its own selection, without security.    The law provided that the assets, upon a dissolution of the company by judgment, should go into the hands of receivers, who should give bond,

Hargroves *vs.* Chambers.

with good security. To the protection of the law, this bank and its officers did not think proper to trust. But the law excluded the bank and its officers from all control. How so? What control did the bank or its officers have after that deed of assignment? If that assignment was a *bona fide* one, it excluded the bank and its officers from any control of the assets as effectually as the law could have done. But concede the fact that the law did exclude the bank and its officers from the control of the assets, yet it gave none to the creditors, nor any power over them. Did this provision exclude the bank, the directors, or any one of the stockholders from appealing to a Court to compel the assignee to discharge the duties of his appointment, or to have a new one appointed? They all knew of what the assets consisted; what was necessary to be done to make them available; what was being done; yet not one word of complaint is made against him until the assets are gone. The complaint does not appear to be well grounded.

For these reasons, we hold that the creditor's claim on the directors was not prejudiced by the neglect or waste of the assets by the assignee.

5. The next question is, whether the plaintiff was barred by the Statute of Limitations, considered as a penalty, a simple contract, specialty or statutory liability?

This question was adjudicated directly, as to stockholders, in *Lane vs. Morris*, 10 *Ga.*, 164, and in *Thornton vs. Lane*, 11 *Ga.*, 459, and as to directors, in *Neil vs. Briggs*, 12 *Ga.*, 104; nor have those decisions been disturbed or doubted by any of the subsequent cases. They must stand, therefore, as settled. Counsel for defendants made, in the argument, a most labored effort to show that the liability of the directors, whether on the statute or on the certificates, was matter of contract; in the one case, a specialty, and in the other, a simple contract. If a specialty, it was barred by the Act of 1805, in four years, and in the other, in four or six years. We admit that the Act of incorporation is, of itself, when considered as between the Legislature and the corporator, a contract. The Legislature, by the Act, grants to the corporators certain privileges; they accept and enter into the enjoyment. This is the contract, and considered so for the benefit of the corporators; for by it, viewed as a contract, they are protected from subsequent legislation; still, the Act

of incorporation is a law of the State, and does not depend, for its existence as a law, upon the acceptance or ratification of the corporators, but their acceptance and performance clothes them with its privileges and brings them within its operations as a law already enacted.   The liability imposed by the statute is statutory, because it depends for its existence solely on the statute, and not upon any special contract between the corporator and the person with whom he deals.   For instance, the contract in this case between Hargroves and the bank, as shown by these certificates, is a simple contract.   The bank, in consideration of the money received, agrees to pay him that amount of money, with interest.   Now, as between Hargroves and the bank, the liability of the bank is the same as if the contract was between natural persons, and governed by the same rules.   But as there was an excess of indebtedness, in violation of the fourth rule of the sixth section of the Act at the time the directors became liable for the payment of that debt, not by the contract between Hargroves and the bank, or any contract between the directors and Hargroves, but in consequence of a stipulation in the statute that they should be liable upon such contingency.   There is, in fact, no contract between Hargroves and the directors, although their liability, so created, is an incident to his debt, a security afforded by the statute, and one of the inducements held out by the law to Hargroves and all others, to deal with and trust the bank.   To our minds, it is clear that the liability of these directors is statutory, and not a specialty contract—remedial and not penal, and that the right of action is barred only after a period of twenty years.

That the Act of 1805 does not create a bar to a statutory liability, but to specialty contracts not specialties generally, is demonstrated by Judge WARNER in *Lane vs. Morris*, 10 *Ga.*, 164.   Anything that I could say on that subject would not strengthen that most satisfactory argument, and would be but a reproduction of the same thing in a less forcible and conclusive manner.

6. It is contended that the judgment of forfeiture pronounced against the bank in June, 1843, dissolved the corporation, extinguished the debts due to and from the Company, and with the debts of the bank fell the liability of the directors.   We hold that the judgment did not have that effect.

If it was true, as counsel insist, that a dissolution of a corporation by judgment of forfeiture or by expiration of its charter, extinguished the debts due to and from such company, this judgment of forfeiture could not have that effect, because the Act of 18th December, 1840, and 13th December, 1842, under which the judgment of forfeiture was pronounced, prescribed, in terms, what effect that judgment should have. The right to collect and pay its debts, sell its estate, both real and personal, was, by the Act of 1842, expressly saved from the operation of the judgment. But it is said, that as the judgment did not contain such saving, and was, on the contrary, a general, unlimited judgment of absolute forfeiture of a Court of competent jurisdiction, and of force until set aside, it must have that effect. We do not think it was necessary that the judgment should contain such saving. It was for the Court to pronounce the judgment as it did, and it was for the law to say what should be the effect of such judgment. That the law has done, and the judgment cannot have a more extended effect than that expressly provided and intended. But the judgment of forfeiture, independently of such saving in the Act, could not have the effect claimed, and as our judgment on the effect of a dissolution of the Company, by expiration of the charter, will apply equally to that by judgment, by forfeiture, I shall pass from this point, referring to, and adopting all that is said on the point by this Court in *Lane vs. Thornton*, 10 *Ga.*, 459; *Hightower vs. Thornton*, 8 *Ga.*, 492.

7. Another objection urged against the right of the plaintiff to a recovery is, that the statute which created this liability—that of the Act of incorporation having expired by its own limitation on the first of January, 1857—that the liability expired with the Act. A decision of this Court, in *The Bank of St. Mary's vs. Clayton*, 12 *Ga.*, 475, and the cases cited in that case, are relied on in support of that position. That was an action by The State, on the information of Clayton, against the Bank of St. Mary's to recover the penalties imposed by the Act of 1835, for issuing change bills, which that bank had violated. While the suit was pending, the Act was repealed. The Court held, that "a penalty cannot be recovered after the expiration of the law which imposes it, either by its own limitation or a repeal by the power which enacted it, and the fact of the commence-

ment of the suit by the informer, who would be entitled to one-half of the recovery, did not change the rule, as that did not give him a *vested right* in the penalty, but at most, only an inchoate right, that could be *fixed* or *vested* by judgment; that no judgment could be recovered on a repealed statute; that the repeal of the statute prevents the imperfect right from being consummated; from becoming a *vested right or contract;* and that was the conclusion to which the Court came from a review of all the authorities cited, and they are numerous: *Miller's Case,* 1 *W. Black, R.,* 451; *Lewis vs. Foster,* 1 *N. Hamp. R.,* 61; *Oriental Bank vs. Freese,* 18 *Maine,* (6 *Shep.,*) 109; *People vs. Levingston,* 6 *Wend.,* 536; *Fenelon & McMasters' Petition,* 7 *Barr.,* 173; *Stoever vs. Immell,* 1 *Wat.,* 258; *Buckallow vs. Ackerman, Hal. N. J. R.; Commonwealth vs. Welch,* 3 *Dana,* 330; *Allen vs. Faran,* 2 *Bailey,* 584; *Pope vs. Lewis,* 4 *Ala.,* 487; *Yeaton vs. The United States,* 5 *Cranch,* 281; *Schooner Rachel vs. The United States,* 6 *Cranch,* 329; *The United States vs. Preston,* 3 *Peters,* 57; *Norris vs. Crocker,* 13 *Howard,* 431; and these cases are all relied on in support of the proposition, that these defendants are relieved from their liability by the expiration of this charter. They do not support it. There is the essential difference, that the subject-matter of all these suits were penalties prescribed for the violation of some public law or rights that could only be vested by judgment, and in which the informer or prosecutor had no vested right; no right grounded on a contract; no right but such as a judgment would give. The Courts held in all the cases that the repeal of the law imposing the penalty defeated the recovery, and all concede that if the right was a vested one, or was secured by contract, a repeal of the law could not take away the right. In this way, wherever the question is discussed by the Courts, these authorities not only do not support the proposition, but they establish the contrary. As the extract from Blackstone in the principal case bears right on this question, I will repeat it: "And here we must be careful to distinguish between the property, the right of which is before vested in the party, and of which possession is only recovered by suit or action, and property to which a man before had no determinate title or certain claim, but he gains, as well the right as the possession, by the process and the judgment of the law. Of

Hargroves *vs.* Chambers.

the former sort, are all debts and choses in action, as if a man give bond for £20, or agrees to buy a horse at a stated sum, or takes up goods of a tradesman, upon an implied contract, to pay as much as they are reasonably worth: in all these cases, the right accrues to the creditor, and is completely vested in him, at the time of the bond being sealed, or the contract or agreement made, and the law only gives him a remedy to secure the possession of that right, which already, in justice, belongs to him. But there is also a species of property to which a man has not any claim or title whatever until after suit commenced and judgment obtained in a Court of law, where the right and remedy do not follow each other, as in common course, but accrues at one and the same time, and when before judgment, a man cannot say he has any absolute property, either in possession or claims," of these are penalties, damages, costs and expenses. 1 *Black. Com.*, 437. There is the difference in Clayton's case. The thing sued for was a penalty. His right depended on the judgment. The plaintiff here sues for a thing that belongs to him in right of his contract. His right and remedy go together. The liability of these defendants is not a penalty, and so adjudged in all the cases. *Banks vs. Darden*, 18 *Ga.*, 318. But it is a right vested in the plaintiff at the time of making the contract with the bank, as an incident to that contract and a security for its performance.

I refer to but one other authority, and it is that of *Stevenson vs. Oliver*, 8 *Mees. & Wels.*, 234, in which all the Judges held, the point being directly made, and the only one in the case, that rights acquired under a temporary statute are permanent and continue after the expiration of the law. Parke remarked, in his opinion, " that there was a difference between a statute repealed and one expiring by its own limitation; that a statute repealed was as if it never existed ;" and I mention this because I have my doubt as to whether a penalty *even* could be avoided that was imposed by a statute that had expired by its own limitation, and which had not been repealed; and I think the Court, in *St. Mary's Bank vs. Clayton*, ought not to have said that a penalty cannot be recovered after the expiration of the law, particularly as there was no necessity to say so in that case.

8. Were the debts of the corporation extinguished by the

expiration of the charter? and if so, did the liability of the directors fall with those of the corporation?

We admit that it is laid down broadly by Judge Blackstone, in his *Com.*, 1 *Vol.*, 484, and by Chancellor Kent, in his *Com.*, 2 *Vol.*, 307, and in *Ang. & Ames on Cor.*, 823: "That the debts of a corporation, either to or from it, are totally extinguished by its dissolution, so that the members thereof cannot recover, or be charged with them, in their natural capacities." The commentators cite, in support of the text, 1 *Lev.*, 237; *Co. Litt*, 136; *Colchester vs. Seaber*, 3 *Burrow*, 1,868, *arg.*; *Rex vs. Passmore*, 3 *T. R.*, 241; *Grant on Cor.*, 303, states the rule a little differently, thus: "Both the property, choses in action, and other rights of the corporation, as well as its liabilities, *ipso facto*, pass from it on the event of dissolution. *Fonblanque*, 308, still different: "Neither can they (the corporation) be charged in their private capacity with the debts of the corporation, although dissolved." Same references. No practical good could possibly result from a review of the cases referred to by those text writers, especially as they have already undergone such extended investigations by different members in this Court, in the cases to which I have so frequently referred. Nothing that I could say would add to what is said by Judge Lumpkin on the one side, or detract from what Judge Benning says on the other, in *Moultrie vs. Smily*, 16 *Ga.*, 289. There may be found all the learning and law of the case, on both sides. It is sufficient to say here that the conclusion to which the Court has come, after a patient consideration of the whole of the authorities and able arguments of counsel, is, that the precedents do not support the texts of the authors which I have stated. It would, perhaps, be too broad to say that there is no foundation for the rule, but we are clear that the rule, as stated, must be taken in a much less limited sense than as stated by those able expositors of the law. But if the rule be taken as applicable to such corporations as existed most commonly in England, such as were for political, religious, educational or charitable purposes, then the principle is correctly stated; for in all such cases as those, we can very well see how and why it is that the debts due to and from them are extinguished totally by a dissolution. There are more reasons than one why it should be so. There is no one to sue or be sued. The purposes for which dona-

Hargroves *vs.* Chambers.

tions and grants were made, have failed. The members of the corporation have no personal interest in the assets, one way or the other. They cannot take them, nor be chargeable with them. They (the assets—personal) necessarily become vacant. But when the rule is to be applied to joint stock companies, or that class of corporations that are incorporated for purposes of trade and are the subjects exclusively of private venture, there is no reason for the rule, and the rule itself must cease, for it is wholly inapplicable and in appropriate. It would defeat the purposes of the law, and be the destruction of every principle of justice, not only as to the corporators themselves, but to individuals and the public at large who have dealt with them.

Corporations, most akin to this, at common law, were the creatures of favorites of the Crown, created for some great public good, and as inducements to its subjects to engage in trade and commerce, so that the greatness and power of the government might be extended and enriched ; hence, large grants of privileges were made, and every facility and protection given to induce capital and individual enterprise to engage in pursuits that would bring back to the source of power so many corresponding benefits. Here they are regarded as monopolies, obnoxious to individual and private enterprise, and are to be restricted and governed by different rules. Such a corporation as this would not be one at common law. It lacks perpetuity, an essential element in a corporation at common law. The members are individually liable for the debts, an element utterly opposed to their very being, such a principle, as some one said, speaking of Dr. Salmon's case, as excluded the idea of corporation. How can the rule of administration of disposition of assets, at the death of the one, apply to, and govern in the case of the other ? Could the Legislature, in the incorporation of this bank for a definite period, have intended that at the expiration of that time the capital stock paid in, and the profits of the business, should utterly fail, or worse than that, (for the corporation might provide against such calamity as to themselves by administering before its death); but that the debts should fail, that those who have trusted the bank, who hold their bills, shall lose their debts? Certainly not ; for why then attach the personal liability clause? It is no answer to say that those who deal with the bank are acquainted

with its condition, and deal with their eyes open. That I know has been said, upon the idea, that what one may know, he must know; but, in point of fact, it is not true. For how many are there who daily receive and pay away bank-bills that know not when the charter expires, or anything else about them, except that they received them as money and paid them out in the same way? By applying this rule, these restrictions on the bank, intended for the security and protection of those who deal with them, are employed to the advantage of the bank and injury of the citizen, by enabling them to get a credit, in the first place, on the faith of the personal liability of the members, and then by the expiration of the charter to die out of it and hold their unjust acquisition by withdrawing them from the corporation before its death. But it cannot be so. The application of such a principle, under the circumstances, would be monstrous—without and against reason.

But it may be asked, if this rule does not apply, how are we to get one, in the absence of any legislative provision, to meet the case? And we answer, that a Court of Equity, in such a case, (I mean the dissolution of a corporation with assets and outstanding debts), would lay hold of the assets and administer and distribute them for the benefit of all interested. Why not? And what is the objection to it? I have yet to hear or see one. Collier, J., in *Paschal vs. Whitsell*, 11 *Ala.*, 477, says that it is a settled rule in equity. *Story Eq.*, sec. 252, lays down the rule broadly, and this Court has *decided* it to be so, in *Hightower vs. Thornton*, 8 *Ga.*, 492. If this rule exists in equity—and that it does, there can now be no doubt, in Georgia at least—the position of the defendants falls to the ground; for their entire dependence is on the idea of an utter extinguishment of the debt, with all its incidents, not only as against the corporation, but as against the assets and against all others liable on the debt with the bank, *that the debt is annihilated*, so that it cannot even be revived.

9. Suppose, however, that we admit that the debt of the corporation is extinguished by its death, how does that affect the liability of these directors? Their liability is independent entirely of that of the bank, and exists for a different reason. They are, by the charter, to be liable for this debt in their individual capacity. What does the continuance or

dissolution of the corporation have to do with the individual rights or liablilities of its members? Nothing whatever. The liability of the director is created by his own act, and in derogation of the chartered privileges, is not dependent on its continuous existence, and its failure does not protect him, but it does and must remain *until satisfied,* or released by the act of the creditor.

10. There is another view of this whole question, that is absolutely conclusive, to my mind.   The assignment, by the bank of its assets for the payment of debts being a valid one, and the saving in the Act of 1842 providing for rendition of a judgment of forfeiture, and the recitative enactments of the Act of 1843, that the judgment rendered, was such an one as was provided for and contemplated by the Act of 1840 and 1842, abrogated the rule of extinguishment, even if it could be said to apply to this corporation, and provided for an admininstration and disposition of the assets of the bank, and subserving the ends of the law and protecting and guarding the rights of all parties, and the subsequent expiration of the time limited for the continuance of this corporation did not alter, interfere with or affect these corporative and statutory provisions and dispositions for the protection and security of these assets and liabilities from destruction by any possible rule of construction.

Our conclusion on all the points taken is, that the defendants are liable, and plaintiff entitled to recover, and the Court below erred in holding otherwise.

Judgment reversed.